Joseph A. Ruta (JR0010)
RUTA SOULIOS & STRATIS LLP
101 Town Center Drive, Suite 111
Warren, New Jersey 07059
Telephone: (212) 997-4500
jruta@lawnynj.com
Attorneys for Plaintiffs and the Proposed Class

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MALIAKA JOHNSON, TOM MESMER, and STEVEN SCHWARZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS INCORPORATED,<br><br>Defendant. | Case No. ________________<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

Plaintiffs Maliaka Johnson, residing at 106 Shamrock Drive, Summerville, South Carolina 29483, Tom Mesmer, residing at 1200 Country Club Drive, Apt. 5506, Largo, Florida 33771, and Steven Schwarz, residing at 5662 Auburn Boulevard, Space 19, Sacramento, California 95841 (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint (the "Action") against Quest Diagnostics Incorporated ("Quest" or "Defendant"), whose principal place of business is located at 500 Plaza Drive, Secaucus, New Jersey 07094, and allege upon personal knowledge as to themselves and their own actions, and upon information and belief as to all other matters, as follows:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this Class Action Complaint against Quest for its failure to secure and safeguard personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") that was entrusted to Defendant.

2. On October 21, 2026, Quest learned of "unauthorized access to its Quanum LSM system, which certain clients use to place test orders, receive and look up results."[1]

3. This cybersecurity incident resulted in the breach and/or compromise of patient records containing the sensitive personal and medical data of Plaintiffs and numerous other individuals, including but not necessarily limited to Private Information (the "Data Breach").

4. Quest is a clinical diagnostic laboratory company headquartered in Secaucus, New Jersey. By its own account, Quest "serves half the physicians and hospitals in the United States and one in three American adults each year," and it generated 2025 revenues of approximately $11.04 billion.[2] Quest, as a substantial business, had the resources to take seriously the obligation to protect Private Information. However, Quest failed to invest the resources necessary to protect the Private Information of Plaintiffs and Class members.

5. Upon information and belief, Quest failed to implement practices and systems in order to mitigate against the risks posed by Quest's negligent (if not reckless) IT practices. As a result of these failures, Plaintiffs and Class members face a litany of harms that accompany data breaches of this magnitude and severity.

6. As such, Plaintiffs, on behalf of themselves and all others similarly situated, bring this Action for restitution, actual damages, nominal damages, injunctive relief, disgorgement of

---

[1] Quest Diagnostics Inc., Current Report (Form 8-K) (Oct. 22, 2026), https://www.sec.gov/Archives/edgar/data/1022079/000094787126000941/ss6979200_8k.htm.
[2] Quest Diagnostics, *Quest Diagnostics Facts at a Glance*, https://newsroom.questdiagnostics.com/Fact-sheet (last visited Oct. 22, 2026).

profits, and all other relief that this Court deems just and proper.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative Class members; and minimal diversity exists because one or more putative Class members are citizens of a different state than Defendant. 28 U.S.C. § 1332(d)(2)(A). Defendant, a corporation, is a citizen of Delaware, the State under whose laws it is incorporated, and New Jersey, the State in which it has its principal place of business. 28 U.S.C. § 1332(c)(1). Plaintiff Johnson is a citizen of South Carolina, Plaintiff Mesmer is a citizen of Florida, and Plaintiff Schwarz is a citizen of California. Upon information and belief, fewer than one-third of the members of the Class are citizens of New Jersey, the State in which this Action is filed and in which Defendant maintains its principal place of business, because Defendant, by its own account, serves half the physicians and hospitals in the United States and one in three American adults each year and operates approximately 2,000 patient service centers.[3] Accordingly, none of the exceptions set forth in 28 U.S.C. § 1332(d)(3) and (d)(4) applies.

8. This Court has personal jurisdiction over Quest because Quest maintains its principal place of business and operations in New Jersey, because Quest intentionally availed itself of this jurisdiction by regularly conducting business in New Jersey, and because, upon information and belief, Quest's acts and omissions giving rise to Plaintiffs' and the Class's claims occurred in and emanated from New Jersey.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because

[3] *Id.*

Quest's principal place of business is in Secaucus, New Jersey, within this District, and pursuant to 28 U.S.C. § 1391(b)(2) because, upon information and belief, Quest's data security decisions and practices at issue in this Action, including those concerning the Quanum LSM system, were made and implemented in this District.

## III. PARTIES

10. Plaintiff Maliaka Johnson is, and at all times relevant to this Action was, a resident and citizen of South Carolina. Plaintiff Johnson resides in Summerville, South Carolina. Plaintiff Johnson is a customer of Quest. Upon information and belief, Plaintiff Johnson's Private Information was maintained in or accessible through the Quanum LSM system and was compromised in the Data Breach.

11. Plaintiff Tom Mesmer is, and at all times relevant to this Action was, a resident and citizen of Florida. Plaintiff Mesmer resides in Largo, Florida. Plaintiff Mesmer is a customer of Quest. Upon information and belief, Plaintiff Mesmer's Private Information was maintained in or accessible through the Quanum LSM system and was compromised in the Data Breach.

12. Plaintiff Steven Schwarz is, and at all times relevant to this Action was, a resident and citizen of California. Plaintiff Schwarz resides in Sacramento, California. Plaintiff Schwarz is a customer of Quest. Upon information and belief, Plaintiff Schwarz's Private Information was maintained in or accessible through the Quanum LSM system and was compromised in the Data Breach.

13. Defendant Quest is a Delaware corporation and a clinical diagnostic laboratory company. Quest's principal place of business is located at 500 Plaza Drive, Secaucus, New

Jersey 07094. Quest's common stock is listed on the New York Stock Exchange under the symbol "DGX."

## IV. FACTUAL ALLEGATIONS

### *A. Defendant's Business and Collection of Private Information*

14. Quest is a clinical diagnostic laboratory company. Quest's clients, including physicians and other health care providers, use Quest's Quanum LSM system to place test orders and to receive and look up test results.

15. Plaintiffs and the rest of the Class members received Quest's laboratory services or otherwise had their Private Information provided to Quest, including by their health care providers when ordering tests, and, in so doing, entrusted Quest with their extremely sensitive and highly valuable Private Information, which Quest acquired from Plaintiffs, the other Class members, and their health care providers in the course of providing services to them.

16. When Plaintiffs and Class members provided their Private Information to Quest, or to health care providers that ordered testing from Quest, they reasonably expected that Quest would safeguard their highly sensitive and valuable information and would make only authorized disclosures of this Private Information.

17. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' Private Information, Quest assumed legal and equitable duties and knew or should have known that it was responsible for ensuring the safety and security of Plaintiffs' and Class members' Private Information and for protecting such Private Information from unauthorized disclosure and exfiltration.

***B. The Data Breach***

18. On October 21, 2026, Quest learned of "unauthorized access to its Quanum LSM system." On October 22, 2026, Quest disclosed in a filing with the U.S. Securities and Exchange Commission that, "[w]hile the full scope of unauthorized access remains under investigation, at this time the Company believes that an unauthorized party accessed certain patient records." Quest also stated that it "has notified federal law enforcement authorities and engaged external cybersecurity experts to assist in the investigation and response."[4]

19. On its website, Quest stated that, "[u]pon discovery of the incident, we paused access to the system," and that "[w]e take privacy and security very seriously."[5]

20. Upon information and belief, because the Quanum LSM system is used to place test orders and to receive and look up test results, the patient records accessed in the Data Breach include, but are not necessarily limited to, patients' names, dates of birth, contact information, the tests ordered for them, the identities of their ordering providers, health insurance information, and laboratory test results.

21. The unauthorized party was able to access the Private Information in the patient records accessed during the Data Breach.

22. The access and/or acquisition of the Private Information from Quest's systems demonstrates that this cyberattack was targeted due to Quest's status as a business that houses sensitive Private Information. The unauthorized party gained access to a system that Quest's clients use to place test orders and to receive and look up test results. And the Private Information compromised, including, upon information and belief, laboratory test results and

---

[4] Quest Diagnostics Inc., Current Report (Form 8-K) (Oct. 22, 2026), https://www.sec.gov/Archives/edgar/data/1022079/000094787126000941/ss6979200_8k.htm.
[5] Quest Diagnostics, *An Update on an Incident Involving One of Our Systems* (Oct. 22, 2026), https://www.questdiagnostics.com/links/quanum-notice (last visited Oct. 22, 2026).

other medical information, is precisely the type of information that enables medical identity theft, fraud, and extortion, because, unlike a credit card number, a patient's test results and medical history cannot be changed. Armed with this Private Information, data thieves (as well as downstream purchasers of the stolen Private Information) can commit a variety of crimes, including as follows: obtaining medical care, prescription drugs, or medical equipment in Class members' names; submitting fraudulent claims to Class members' health insurers; targeting Class members with phishing schemes and extortion attempts that exploit their medical information; and, by combining the Private Information with other information, opening new financial accounts in Class members' names and taking out loans in Class members' names.

23. Due to Quest's flawed security measures, Plaintiffs and Class members now face a present, substantial, and imminent risk of fraud, identity theft, and medical identity theft.

24. Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of Private Information, and despite Quest's large operating budget, Quest provided unreasonably deficient protections prior to the Data Breach, including but not limited to a lack of security measures for storing and handling Private Information, as well as inadequate employee training regarding how to access, how to oversee the protection of, and how to handle and safeguard this sensitive set of information.

25. Quest failed to adequately adopt and train its employees on information security protocols, including storing, locking, encrypting, and limiting access to Plaintiffs' and Class members' highly sensitive Private Information; implementing guidelines for accessing, maintaining, and communicating sensitive Private Information; and protecting sensitive Private Information by implementing protocols on how to utilize, store, and handle such information.

26. Quest's failures caused the unpermitted disclosure of Plaintiffs' and Class members' Private Information to an unauthorized third party and put Plaintiffs and Class members at serious, immediate, and continuous risk of identity theft and fraud.

27. The Data Breach that exposed Plaintiffs' and Class members' Private Information was caused by Quest's violation of its obligations to abide by best practices and industry standards concerning its information security practices and processes.

28. Quest, despite being a sophisticated organization, failed to comply with basic security standards or to implement security measures that could have prevented or mitigated the Data Breach.

29. Quest failed to ensure that all personnel with access to Private Information were properly trained in retrieving, handling, using, and distributing sensitive information. Quest also failed, on information and belief, to detect the unauthorized access to the Quanum LSM system before patient records were accessed.

***C. The Data Breach Was Foreseeable***

30. Quest has weighty obligations created by HIPAA, industry standards, common law, and its own promises and representations to keep Private Information confidential and to protect it from unauthorized access and disclosure. In its Notice of Privacy Practices, Quest tells patients that "Quest Diagnostics is required by law to maintain the privacy of your PHI" and that "[w]e are required to notify affected individuals in the event of a breach involving PHI that is unsecured."[6]

31. Plaintiffs' and Class members' Private Information was provided to Quest, directly or through their health care providers, with the reasonable expectation and mutual

[6] Quest Diagnostics, *Notice of Privacy Practices*, https://www.questdiagnostics.com/our-company/privacy/notice-of-privacy-practices (last visited Oct. 22, 2026).

understanding that Quest would comply with its obligations, including those described in its Notice of Privacy Practices, to keep such information confidential and secure from unauthorized access.

32. Quest's data security obligations were particularly acute given the substantial increase in hacks, malware threats, ransomware attacks, and/or other data breaches in various industries, including the health care and clinical laboratory industry in which Defendant provides services, preceding the date of the Data Breach.

33. Quest was aware of the risk of data breaches because such breaches have dominated the headlines in recent years.

34. Private information, like the Private Information targeted by the hackers in this Action, is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used in a variety of unlawful manners. For example, Private Information can be used to distinguish, identify, or trace an individual's identity. This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as the information compromised in the Data Breach.

35. Given the nature of the Data Breach, it is foreseeable that the compromised Private Information can now be used by hackers and cybercriminals in a variety of different and harmful ways.

36. Cybercriminals who possess Plaintiffs' and Class members' Private Information can (either in isolation or in tandem with other information) obtain medical services or submit insurance claims in Plaintiffs' and Class members' names, or open fraudulent credit cards or other types of accounts in Plaintiffs' and Class members' names.

37. The increase in such attacks, and attendant risk of future attacks, was widely known to Quest, which had itself experienced at least three prior data security incidents affecting patient information, including an incident at a vendor in its billing chain and one at a Quest subsidiary.

38. Quest knew of the risk firsthand. In December 2016, Quest disclosed a data breach affecting about 34,000 people, in which attackers gained access, through an improperly secured mobile application called MyQuest by Care360, to patients' names, dates of birth, lab results, and, in some cases, telephone numbers.[7]

39. In 2019, Quest disclosed that information including certain financial data, Social Security numbers, and medical information of approximately 11.9 million Quest patients had been exposed in a data breach at American Medical Collection Agency ("AMCA"), a billing collections vendor that provided services to Quest's revenue cycle management provider, and that an unauthorized user had access to AMCA's system between August 1, 2018, and March 30, 2019.[8] The resulting litigation, in which Quest was named as a defendant, was centralized in this District.[9]

40. And in 2021, Quest's subsidiary ReproSource Fertility Diagnostics notified approximately 350,000 patients that their data, which could include names, contact information, dates of birth, CPT and diagnosis codes, test requisitions and results, test reports, medical

---

[7] Robert Hackett, *Quest Diagnostics Breach Exposes Health Data of 34,000 Customers*, Fortune (Dec. 13, 2016), https://fortune.com/2016/12/13/quest-diagnostics-data-breach-health/.

[8] Heather Landi, *Quest Diagnostics Breach May Have Exposed Data of 11.9M Patients*, Fierce Healthcare (June 3, 2019), https://www.fiercehealthcare.com/tech/quest-diagnostics-breach-may-have-exposed-data-11-9m-patients.

[9] *See In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, No. 2:19-md-02904 (D.N.J.).

histories, and health insurance information, was potentially accessed or acquired in a ransomware attack.[10]

41. The risk was also well known across the health care and medical technology industries. As one industry publication reported on the day Quest disclosed the Data Breach, "Quest now joins Novocure, Boston Scientific, Medtronic, Stryker, Abbott and iRhythm among the growing number of medtech companies hit by cyber incidents this year."[11]

42. As such, this Data Breach was foreseeable. Defendant was cognizant of the huge risk of data breaches because of how common and high-profile data breaches have become with respect to businesses, such as Quest, and because of its own history of data security incidents.

***D. Defendant Failed to Follow FTC Guidelines and Industry Standards***

43. Experts studying cybersecurity routinely identify businesses that maintain large volumes of individual-specific information, such as Quest, as being particularly vulnerable to cyberattacks because of the value of the data which they collect and maintain. The reason this data is so valuable is because it contains sensitive details such as the Private Information, which can be sold and weaponized for purposes of committing various identity theft-related crimes. It is well-known that, because of the value of this data and Private Information, businesses that collect, store, maintain, and otherwise utilize or profit from Private Information must take necessary cybersecurity safeguards to ensure that the data they possess is adequately protected.

44. Government agencies also highlight the importance of cybersecurity practices. For example, the Federal Trade Commission ("FTC") has promulgated numerous guides for

---

[10] Jessica Davis, *Ransomware Attack on Quest's ReproSource Impacts Data of 350K Patients*, SC Media (Oct. 12, 2021), https://www.scworld.com/analysis/ransomware-attack-on-quests-reprosource-impacts-data-of-350k-patients.

[11] Ben Adams, *Quest Diagnostics' Test Results System Breached in Yet Another Medtech Cyberattack*, Fierce Biotech (Oct. 22, 2026), https://www.fiercebiotech.com/medtech/quest-diagnostics-test-results-system-breached-yet-another-medtech-cyberattack.

businesses, which highlight the importance of implementing reasonable data security practices.

45. According to the FTC, the need for data security should be factored into all business decision-making.[12]

46. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[13]

47. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand network vulnerabilities; and implement policies to correct any security problems.

48. The guidelines also recommend that businesses use an intrusion detection system to detect and expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack their systems; watch for large amounts of data being transmitted from their systems; and have a response plan ready in the event of a breach.

49. The FTC further recommends that companies not maintain Private Information longer than is needed for the purpose for which it was collected; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on their network; and verify that third-party service providers have implemented reasonable security measures.

50. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect sensitive personal data, in some cases treating the failure to

---

[12] *See* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (rev. Aug. 2023), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

[13] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"). Orders resulting from these actions further explicate and clarify the measures businesses must take to meet their data security obligations.

51. Defendant failed to properly implement some or all of these (and other) basic data security practices.

52. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

53. Defendant at all times was fully aware of its obligations to protect Private Information. Defendant was also keenly aware of the significant repercussions that would result from the failure to do so.

54. Several best practices have been identified that, at a minimum, should be implemented by businesses such as Quest. These include but are not limited to, the following: educating all employees about cybersecurity; requiring strong passwords; maintaining multi-layer security, including firewalls, anti-virus programs, and anti-malware software; utilizing encryption; making data unreadable without a key; implementing multi-factor authentication; backing up data; and limiting which particular employees can access sensitive data.

55. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protecting physical security systems; and training staff regarding critical points.

56. The foregoing frameworks are existing and applicable industry standards. Quest failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***E. Defendant Failed to Comply with HIPAA's Mandates***

57. Defendant is a covered entity under HIPAA because it is a health care provider that transmits health information in electronic form in connection with transactions covered by HIPAA (45 C.F.R. § 160.103), and as such is required to comply with (a) the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information") and (b) the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

58. Defendant is also subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH")[14], 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

59. HIPAA's Privacy Rule (or Standards for Privacy of Individually Identifiable Health Information) establishes national standards for the protection of health information.

60. HIPAA's Security Rule (or Security Standards for the Protection of Electronic Protected Health Information) establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

61. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

---

[14] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

62. "Electronic protected health information" is, as relevant here, "individually identifiable health information … that is (i) transmitted by electronic media; [or] (ii) maintained in electronic media." 45 C.F.R. § 160.103.

63. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

64. HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

65. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. See 45 C.F.R. § 164.308(a)(1) and § 164.306(a)(3).

66. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following the discovery of a breach."[15]

67. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

68. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity. *See* 45 C.F.R. § 164.530(f).

69. HITECH also requires the Office for Civil Rights ("OCR") within the Department of Health and Human Services ("HHS") to issue annual guidance documents on the HIPAA Security Rule. See 42 U.S.C. § 17931(c). For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[16] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says, "represent the industry

---

Breach Notification Rule, Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Oct. 22, 2026).

Dep't of Health & Human Servs., Security Rule Guidance Material, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Oct. 22, 2026).

standard for good business practices with respect to standards for securing e-PHI."[17]

***F. Defendant's Breaches of Its Obligations***

70. Defendant breached its obligations to Plaintiffs and Class members and was otherwise negligent and/or reckless because Defendant failed to properly maintain, oversee, and safeguard its computer systems, network, and data. In addition to its obligations under federal and state law, Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care when obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class members to provide reasonable security, including complying with industry standards and requirements, providing training for its staff, and ensuring that its computer systems, networks, and protocols adequately protected the Private Information of Plaintiffs and Class members.

71. Defendant's wrongful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

b. Failing to implement updates and patches in a timely manner;

c. Failing to properly monitor the Quanum LSM system and its other computer systems for vulnerabilities, existing intrusions, and unauthorized access;

d. Failing to ensure that all employees and third parties install the latest software patches, update their firewalls, check user account privileges, and ensure proper security practices;

---

Dep't of Health & Human Servs., Guidance on Risk Analysis, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Oct. 22, 2026).

e. Failing to ensure that all employees and third parties practice the principle of least privilege and maintain proper credential hygiene;

f. Failing to implement adequate access controls for users of the Quanum LSM system;

g. Failing to monitor for and detect anomalous access to and retrieval of patient records through the Quanum LSM system;

h. Failing to adequately restrict access to Private Information through the Quanum LSM system; and

i. Failing to timely detect and stop unauthorized access to the Quanum LSM system.

72. As the result of its inadequate procedures for handling cybersecurity threats, Quest negligently and wrongfully failed to safeguard Plaintiffs' and Class members' Private Information.

73. Accordingly, as further detailed herein, Plaintiffs and Class members now face a substantial, increased, and immediate risk of fraud, identity theft, medical identity theft, and the disclosure of their sensitive and personal information.

***G. Data Breaches Are Harmful and Disruptive***

74. The United States Government Accountability Office ("GAO") released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft may face "substantial costs and time to repair the damage to their good name and credit record."[18]

[18] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

75. Cybercriminals monetize private information by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the greater number of accurate individual pieces of data an identity thief obtains regarding a person, the easier it is for that thief to take on the victim's identity, or otherwise to harass or track the victim.

76. For example, armed with only a name and other identifying information, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information regarding a victim's identity, such as a person's login credentials. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls, deceptive text messages, and phishing emails.

77. Medical information is especially valuable to criminals and especially damaging to victims. As the FTC explains, medical identity theft occurs when someone uses another person's personal information, such as a health insurance account number, "to get medical care, see a doctor, get prescription drugs, buy medical devices, or submit claims with your insurance provider," and "[i]f the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use."[19] And unlike a credit card number or password, a patient's laboratory test results and medical history cannot be changed once they are exposed.

78. Because of the threat of these harms, the FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach,

---

[19] Fed. Trade Comm'n, *What To Know About Medical Identity Theft* (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft.

including contacting one of the credit bureaus to place a fraud alert (and potentially obtaining an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

79. Theft of Private Information is gravely serious. Private Information is an extremely valuable property right.

80. According to the GAO:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

81. Private information, such as the Private Information compromised herein, is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. The private information of individuals remains of high value to criminals, as evidenced by the prices paid through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, certain sets of private information can be sold at a price from $40 to $200.[21] Medical information, which upon information and belief was compromised in this Data Breach, is particularly valuable. Clearly, all this data has real value—which is why it is often targeted and stolen in the first place.

---

[20] *See* Fed. Trade Comm'n, *IdentityTheft.gov*, https://www.identitytheft.gov/Steps (last visited Oct. 22, 2026).

[21] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

82. Because the Private Information compromised in the Data Breach was deliberately accessed by an unauthorized party, and is of the type routinely sold and traded on the dark web, Plaintiffs and Class members are at a substantial imminent risk of injury, including an increased risk of fraud, identity theft, and medical identity theft for many years into the future.

83. Thus, Plaintiffs and Class members must vigilantly monitor their financial accounts, health insurance statements, and other indices of identity theft (i.e., the mail, email, etc.) for many years to come.

**H. Plaintiffs' Experiences**

84. Each Plaintiff is a customer of Quest. In connection with Quest's services, each Plaintiff's Private Information was provided to Quest.

85. Plaintiffs reasonably expected that Quest would keep their Private Information, including their medical information and test results, confidential and secure.

86. Upon information and belief, Plaintiffs' Private Information was maintained in or accessible through the Quanum LSM system and was accessed by the unauthorized party in the Data Breach.

**I. Harm to Plaintiffs and the Class**

87. Plaintiffs and Class members suffered actual injury from having their Private Information compromised as a result of the Data Breach, including, but not limited to, as follows: (a) the compromise of their Private Information to an unauthorized party; (b) damage to and diminution in the value of their Private Information, a form of property that Defendant obtained from Plaintiffs, Class members, and their health care providers; (c) violation of their privacy, including the compromise of highly sensitive Private Information; (d) present,

imminent, and impending injury arising from the increased risk of identity theft and fraud; and (e) actual and potential out-of-pocket losses, including the loss of time and the loss of money.

## V. CLASS ALLEGATIONS

88. Plaintiffs bring this nationwide Class Action on behalf of themselves and on behalf of all others similarly situated pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. The "Class" that Plaintiffs seek to represent is defined as follows:

> **Class Definition.** All individuals in the United States whose Private Information was maintained by Quest and was accessed or compromised in the Data Breach.

89. Excluded from the Class are Defendant and Defendant's subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

90. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

91. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, given that Quest serves half the physicians and hospitals in the United States and one in three American adults each year, and that Quest's clients use the Quanum LSM system to place test orders and to receive and look up test results, there are at least thousands of individuals whose Private Information was improperly accessed in the Data Breach, and each Class member is identifiable within Defendant's records.

92. **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Plaintiffs and Class members to safeguard their Private Information;

f. Whether Defendant breached its duties to Plaintiffs and Class members to safeguard their Private Information;

g. Whether computer hackers / cybercriminals obtained Plaintiffs' and Class members' Private Information in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Plaintiffs and Class members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's acts, inactions, and practices complained of herein amount to a breach of implied contract and/or common law negligence; and

k. Whether Plaintiffs and Class members are entitled to compensatory damages, exemplary damages, punitive damages, equitable relief, and/or injunctive relief.

93. **Typicality. Plaintiffs**' claims are typical of those of other Class members because Plaintiffs' Private Information, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiffs, like all Class members, were injured by Defendant's uniform conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

94. **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class, and they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiffs suffered are typical of the other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have a genuine personal interest, not a mere technical interest, in the outcome of this Action. Plaintiffs have retained counsel experienced in complex class action litigation, including, but not limited to, data privacy class action litigation, and Plaintiffs intend to prosecute this Action vigorously. Therefore, Plaintiffs can and will fairly and adequately protect and represent the interests of the Class.

95. **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts. Without a class

action, it is likely that many members of the Class will remain unaware of the claims they may possess.

96. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action. This proposed class action does not present any unique management difficulties.

97. Adequate notice can be given to Class members directly using information maintained in Defendant's records.

98. **Predominance.** The issues in this Action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Defendant has engaged in a common course of conduct toward Plaintiffs and Class members. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

## COUNT I

## NEGLIGENCE

99. Plaintiffs repeat and reallege paragraphs 1-87 above as if fully set forth herein.

100. Plaintiffs and Class members provided their Private Information to Quest, directly or through their health care providers, as a condition of obtaining laboratory services.

101. Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care in securing, safeguarding, storing, and protecting the Private Information of Plaintiffs and

Class members – which Defendant received from Plaintiffs, Class members, and their health care providers as a condition of providing services – from being compromised, lost, stolen, accessed, or misused by unauthorized parties.

102. This duty included obligations to take reasonable steps to prevent disclosure of the Private Information, and to safeguard the information from theft. Quest's duties included the responsibility to design, implement, and monitor its data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

103. Defendant owed a duty of care to Plaintiffs and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, its policies and procedures, and the personnel responsible for them adequately protected the Private Information.

104. Defendant owed a duty of care to safeguard the Private Information due to the foreseeable risk of data breaches and the severe consequences that would result from its failure to safeguard Private Information. Defendant's duty also arose from its own affirmative conduct: Defendant chose to collect and store Plaintiffs' and Class members' Private Information, including their laboratory test results, and to make it accessible through the Quanum LSM system, and in doing so created a foreseeable risk of harm to Plaintiffs and Class members if that system was not reasonably secured.

105. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and those individuals whose Private Information was entrusted to Defendant, which duty is recognized by laws and regulations, including but not limited to the FTCA, HIPAA, and common law.

106. In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the FTCA, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

107. Further, Quest had a duty under HIPAA to "reasonably safeguard" protected health information from "any intentional or unintentional use or disclosure that is in violation of" the HIPAA Privacy Rule and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1), (c)(2)(i). Some or all of the information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

108. Defendant's duty to use reasonable care in protecting Private Information arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect Private Information that it acquires, maintains, or stores.

109. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class members could and would suffer if their Private Information were wrongfully disclosed.

110. Defendant had a special relationship with Plaintiffs and Class members. Plaintiffs' and Class members' willingness to entrust Defendant, directly or through their health care providers, with their Private Information as a condition of receiving services was predicated on the understanding that Defendant would take adequate security precautions to protect that Private Information.

111. By assuming the responsibility to collect and store this data, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

112. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class members' Private Information, as alleged and discussed above.

113. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class members' Private Information would result in injury to Plaintiffs and Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches against companies that have custody of private information, and given Quest's own prior data security incidents.

114. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class members' Private Information would result in one or more types of injuries to Class members.

115. The imposition of a duty of care on Defendant to safeguard the Private Information it maintained, transferred, stored, or otherwise used is appropriate because any social utility of Defendant's conduct is outweighed by the injuries suffered by Plaintiffs and Class members as a result of the Data Breach.

116. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class members are at a current and ongoing imminent risk of identity theft, and Plaintiffs and Class members have sustained or will sustain compensatory damages, including the following: (i) invasion of privacy; (ii) financial out-of-pocket costs incurred mitigating the material risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the

material risk and imminent threat of identity theft; (iv) financial out-of-pocket costs that will be incurred due to identity theft resulting from the Data Breach; (v) loss of time that will be incurred due to such identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future costs of identity theft monitoring and/or credit monitoring; (ix) anxiety, annoyance, and nuisance; and (x) the continued risk to Private Information, which remains in Defendant's and the threat actors' respective control, and which is subject to further breaches, including for so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' Private Information.

117. Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

118. Quest's negligent conduct is ongoing, in that Quest still holds the Private Information of Plaintiffs and Class members in an unsafe and insecure manner.

119. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit and medical identity theft monitoring to all Class members.

**COUNT II**

**BREACH OF IMPLIED CONTRACT**

120. Plaintiffs repeat and reallege paragraphs 1-87 above as if fully set forth herein.

121. In connection with obtaining laboratory services from Defendant, Plaintiffs and Class members entrusted Defendant, directly or through their health care providers, with their Private Information.

122. By accepting Plaintiffs' and Class members' Private Information for the purpose of providing laboratory services, and by representing in its Notice of Privacy Practices that it is required by law to maintain the privacy of their PHI, Defendant entered into an implied contract with Plaintiffs and Class members that it would protect the Private Information it received concerning them.

123. Plaintiffs and Class members were required to provide their Private Information to Defendant, directly or through their health care providers, as part of the process of receiving laboratory services. In doing so, they were of the belief that this information would be safely guarded.

124. Defendant accepted possession of Plaintiffs' and Class members' Private Information for the purpose of providing services to them.

125. In providing its services, Defendant knew or should have known that it must protect Plaintiffs' and Class members' confidential Private Information in accordance with Defendant's stated policies, including its Notice of Privacy Practices, industry best practices, and the applicable law.

126. Pursuant to these implied contracts, Defendant agreed to take reasonable measures, consistent with industry standards and its obligations under HIPAA, to protect Plaintiffs' and Class members' Private Information from unauthorized access and disclosure.

127. Plaintiffs and Class members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

128. Defendant violated this implied contract and these implied promises by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class members' Private Information.

129. Plaintiffs and Class members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein. Plaintiffs and Class members seek damages, including restitution, actual damages, nominal damages, and any other awardable form of damages, in an amount to be proven at trial.

**COUNT III**

**DECLARATORY JUDGMENT**

130. Plaintiffs repeat and reallege paragraphs 1-87 above as if fully set forth herein.

131. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights, statuses, and legal relations of the parties and to grant further necessary relief.

132. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class members from further data breaches that compromise their Private Information. Plaintiffs allege that Defendant's data security measures remain inadequate. Although Quest has stated that it paused access to the Quanum LSM system, it has not disclosed how the unauthorized party obtained access or what measures it has taken to prevent further unauthorized access. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

133. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure Private Information and to timely notify impacted individuals of a data breach under common law and state statutes; and

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

134. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Private Information in its possession.

135. If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

136. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damages. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable protective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

137. Issuance of the requested injunction is in the public interest. Such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and Class members whose confidential information would be further compromised.

## VI. PRAYER FOR RELIEF

138. WHEREFORE, Plaintiffs, on their own behalf and on behalf of all others similarly situated, pray for relief as follows:

A. For an Order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B. For an award of actual damages, exemplary damages, punitive damages, compensatory damages, and nominal damages, in an amount to be determined, as allowable by law;

C. For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiffs and the Class which remains in Defendant's possession;

D. For declaratory relief;

E. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F. Pre- and post-judgment interest on any amounts awarded; and

G. Such other and further relief as the Court may deem just and proper.

## VII. JURY TRIAL DEMAND

139. Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED: October 22, 2026

Respectfully submitted,

*/s/ Joseph A. Ruta*
Joseph A. Ruta (JR0010)
Steven A. Soulios
**RUTA SOULIOS & STRATIS LLP**
101 Town Center Drive, Suite 111
Warren, New Jersey 07059
Telephone: (212) 997-4500
jruta@lawnynj.com

Israel David (*pro hac vice* forthcoming)
israel.david@davidllc.com
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, New York 10004
Telephone: (212) 350-8850
Fax: (212) 350-8860

Mark A. Cianci (*pro hac vice* forthcoming)
mark.cianci@davidllc.com
**ISRAEL DAVID LLC**
399 Boylston Street, Floor 6, Suite 23
Boston, MA 02116
Telephone: (617) 295-7771
Fax: (212) 350-8860

Attorneys for Plaintiffs and the Proposed Class

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I certify under penalty of perjury that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

**CERTIFICATION PURSUANT TO L. CIV. R. 201.1**

I certify that the damages recoverable in this Action exceed the sum of $150,000, exclusive of interest and costs and any claim for punitive damages, and that this Action is therefore not appropriate for compulsory arbitration.

DATED: October 22, 2026

*/s/ Joseph A. Ruta*